IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LATICE PORTER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 C 7165 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Latice Porter ("Porter") filed suit against the City of Chicago ("City"), alleging religious discrimination and retaliation in violation of 42 U.S.C. § 2000e-2 ("Title VII"). Specifically, in Count I, Porter alleges that the City denied her the reasonable accommodation of her religion; in Count II, Porter alleges that the City discriminated and harassed her due to her religion; and, in Count III, Porter alleges that the City retaliated against her when she engaged in a protected activity. Porter moves for summary judgment on Count I with regards to her request for a reasonable religious accommodation.[1] Porter also moves for a declaratory judgment that the City's policy regarding religious accommodations violates Title VII. The City moves for summary judgment on all counts. For the following reasons, the Court denies Porter's Motion for Summary Judgment and her Motion for Declaratory Judgment. The Court grants the City's Motion for Summary Judgment and the case is closed.

---

[1] Porter moves for summary judgment based on the assumption that she has satisfied the *prima facie* elements of her religious accommodation claim. Porter does not move for summary judgment on Count I regarding the issue of undue hardship.

Porter has been employed by the City in the Chicago Police Department's ("CPD") Bureau of Administrative Services, Field Services Section ("FSS"), since June 10, 1991. (Pl. 56.1 Resp. ¶ 3.) Since January 1, 2001, Porter has been a Senior Data Entry Operator and a member of the American Federation of State, County, and Municipal Employees ("AFSCME") union. (*Id*. ¶¶ 3, 4.) Porter's AFSCME contract provides her with a "Religious Day Accommodation," which permits employees to take the day off without pay when they are scheduled to work on a religious holiday; employees must request this day off in writing at least five calendar days in advance of the religious holiday. (Def. 56.1 Resp. ¶ 46; Pl. 56.1 Add. Resp. ¶ 3.)

The City's Municipal Code states that "[n]o employer shall refuse to make all reasonable efforts to accommodate the religious beliefs, observances and practices of employees or prospective employees unless the employer demonstrates that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice without undue hardship on the conduct or the employer's business." (Pl. 56.1 Add. Resp. ¶ 2.) "Reasonable efforts" are defined by the City's Municipal Code to include allowing an employee: to take a day of paid leave or vacation; to be excused from work without pay and without discipline or other penalty; to elect to take the day off with pay in order to practice the employee's religious beliefs and make up the lost

---

[2] Throughout this Opinion, the Court refers to the Parties' Local Rule 56.1 Statements of Undisputed Material Facts as follows: citations to Porter's Local Rule 56.1(a)(3) Statement of Undisputed Facts have been abbreviated to "Pl. 56.1 Ex. __."; citations to the City's Answers to Porter's Local Rule 56.1(a)(3) Statement of Undisputed Facts have been abbreviated to "Def. 56.1 Resp. ¶ __."; citations to the City's Local Rule 56.1(a)(3) Statement of Undisputed Facts have been abbreviated to "Def. 56.1 Ex. __."; citations to Porter's Answers to the City's Local Rule 56.1(a)(3) Statement of Undisputed Facts have been abbreviated to "Pl. 56.1 Resp. ¶ __."; citations to Porter's Statement of Additional Material Facts under LR. 56.1(b)(3)(C) have been abbreviated to "Pl. 56.1 Add. Facts Ex. __."; citations to the City's Response to Porter's Statement of Additional Material Facts under LR. 56.1(b)(3)(C) have been abbreviated to "Def. 56.1 Add. Resp. ¶ __"; citations to the City's Statement of Additional Material Facts under LR. 56.1(b)(3)(C) have been abbreviated to "Def. 56.1 Add. Facts Ex. __."; citations to Porter's Response to the City's Statement of Additional Material Facts under LR. 56.1(b)(3)(C) have been abbreviated to "Pl. 56.1 Add. Resp. ¶ __."

work time at a time and date consistent with the operational need of the employer's business. (*Id*.)

Porter identifies her religion as Christian and she is a student minister at the Apostolic Church of God. (Pl. 56.1 Resp. ¶ 5.) She has attended different church services at different times on Sunday mornings and Friday nights; she has attended Wednesday night bible study; and prayer on Tuesdays. (*Id*.) Porter's church holds Sunday bible study at 8:00 a.m. and Sunday services at 9:00 a.m., 11:45 a.m., and "sometimes" 4:00 p.m. (*Id*. ¶ 51.)

## I.    Chicago Police Department Field Services Section

The CPD FSS receives and responds to information requests from CPD personnel and other law enforcement agencies twenty-four hours a day, seven days a week. (*Id*. ¶ 10.) The FSS staff includes sworn police sergeants, police officers, and civilian employees. (*Id*. ¶ 11.) For scheduling purposes, FSS employees are divided into "watches": the first watch runs from 11:30 p.m. to 7:30 a.m.; the second watch runs from 7:30 a.m. to 3:30 p.m.; and the third watch runs from 3:30 p.m. to 11:30 p.m. (*Id*.) Certain employees in the FSS are assigned to a Friday/Saturday day-off group or a Sunday/Monday day-off group; certain FSS employees are assigned to other day-off groups. (Def. 56.1 Resp. ¶ 10.)

Civilians are assigned to work at a particular FSS section based on the civilian's job title. (Pl. 56.1 Resp. ¶ 11.) The majority of police officers who work in the FSS are there only temporarily. (*Id*. ¶ 13.) Police officers occasionally perform data entry functions but cannot be assigned to a Senior Data Entry Operator position because that position is reserved for civilians under AFSCME's agreement with the City. (*Id*. ¶ 23.) Sergeants serve as watch commanders in the FSS. (Def. 56.1 Resp. ¶ 11.)

Joseph Perfetti ("Perfetti") was the manager of the FSS from approximately April 2002 until

August 2008. (Pl. 56.1 Resp. ¶ 12.) Perfetti was also the Acting Director of the Records Services Division from November 2006 until August 2008 and had the authority to determine and approve FSS employee work schedules. (Def. 56.1 Resp. ¶ 16.) Marikay Hegarty ("Hegarty") was the Director of Records from approximately late 2004 until late 2006 and she had the authority to determine and approve FSS employee work schedules. (Pl. 56.1 Resp. ¶ 12; Def. 56.1 Resp. ¶ 15.) Sergeant H.A. McCarthy ("McCarthy") was a watch commander in the FSS and had the authority to change Porter's schedule from January 2004 through August 2006. (Def. 56.1 Resp. ¶ 12.) Sergeant Geraldine Sidor ("Sidor") was a watch commander in the FSS and had the authority to change the day-off schedules of certain FSS employees from January 2004 through July 2009. (*Id*. ¶ 13.) Sergeant Wanda Torres ("Torres") was a watch commander in the FSS and had the authority to change the day-off schedules of certain FSS employees from January 2004 through July 2009. (*Id*. ¶ 14.)

Robert Flores ("Flores") is an "EEO Specialist" with the Office of Legal Affairs and has been responsible for monitoring allegations of discrimination for the CPD since 2002. (*Id*. ¶ 45.)

## II.     Porter's 2005 Schedule Adjustments

From 1996 until March 2005, Porter was on the second watch, initially on a rotating-weekend day-off schedule that was later changed to an alternating-weekend day-off schedule, pursuant to which she had every other Saturday and Sunday off. (Pl. 56.1 Resp. ¶ 27.) On March 18, 2005, Porter was assigned to the Friday/Saturday day-off group by Sidor, effective March 31, 2005. (Def. 56.1 Resp. ¶ 17.) Porter responded on March 18, 2005 by typing a "To/From" Memorandum to Hegarty requesting to be assigned to the Sunday/Monday day-off group. (*Id*. ¶¶ 18, 19.) Porter told McCarthy that she wanted Sundays off because she is a religious person, was involved in her church,

and sang in the church choir.  (*Id*. ¶ 20.)  On March 18, 2005, McCarthy approved Porter's request and reassigned her to the Sunday/Monday day-off group effective March 27, 2005.  (*Id*. ¶¶ 22, 23.)

On August 25, 2005, Porter asked Torres to change her work hours to accommodate the Saturday ministry classes that Porter had just enrolled in.  (*Id*. ¶¶ 25, 26.)  Torres approved Porter's request to work from 1:30 p.m. until 8:30 p.m. on Saturdays for approximately ten weeks from September 7, 2005 until November 19, 2005.  (*Id*.)  Porter remained on the second watch schedule for the other days of the week.  (*Id*.)

On October 13, 2005, Porter was granted leave pursuant to the Family and Medical Leave Act ("FMLA") until January 13, 2006 due to a car accident and complications related to her pregnancy.  (*Id*. ¶ 28.)  Following her three months of FMLA leave, Porter took a medical leave of absence for another six months, ending on July 16, 2006.  (*Id*.)

## III.   Summer and Fall of 2006

Upon Porter's return to the FSS on July 16, 2006, Sidor recommended, and Perfetti approved, Porter's assignment to the Friday/Saturday day-off group; Porter remained on the second watch.  (*Id*. ¶¶ 29, 30.)  Perfetti and Sidor claim that there were more civilian employees in the Sunday/Monday day-off group than the Friday/Saturday group when Porter returned and that Porter's assignment to the Friday/Saturday day-off group was based on "operational needs" and was done to "balance the workforce."  (Def. 56.1 Ex. 32.)  Sidor was never aware that Porter preferred having Sundays off so she could attend church.  (Pl. 56.1 Resp. ¶ 62.)

AFSCME's Collective Bargaining Agreement states that employees "who return from medical leave of absence within one (1) year shall be reinstated to their former job, subject to layoff and recall provisions."  (*Id*. ¶ 40.)  Though the City has, in the past, often reinstated employees

returning from leave to their former day-off group, the Collective Bargaining Agreement ("CBA") does not require that the City do this for every employee returning from a leave of absence.[3] (Def 56.1 Ex. 40.) There is no indication that Porter's title, salary, hours, or benefits changed from their previous levels when she returned from nine months of leave.

At some point after her assignment to the Friday/Saturday day-off group, Porter informed Perfetti that she goes to church and participates in worship services on Sundays and asked to be reassigned to the Sunday/Monday day-off group. (Def. 56.1 Resp. ¶¶ 30-32.) Following the advice of her AFSCME President, Porter submitted a Request for Change of Job Assignment Form on July 24, 2006, requesting a change to the Sunday/Monday day-off group. (*Id*. ¶ 35.) Perfetti told Porter that if an opening became available in the Sunday/Monday day-off group, her request to change groups would be accommodated. (Pl. 56.1 Resp. ¶ 59.) Porter was aware that "a lot of people" wanted to be in the Sunday/Monday day-off group, in part so they could attend church on Sundays. (*Id*. ¶ 60.) Porter filed a grievance on August 22, 2006 requesting to be moved to the Sunday/Monday day-off group and stating as the reason "that she is a student minister." (Pl. Deposition Exh. 38, Grievance Form 8/22/06.) The grievance was received by Torres on August 31, 2006. (*Id*.) Porter, however, was never reassigned to the Sunday/Monday day-off group. (Def. 56.1 Resp. ¶ 38.) Porter alleges that the City instead responded to her request to change day-off groups by intimidating and harassing her, though she cannot remember anyone at the CPD telling her that

---

[3] Porter's reliance on the Declaration of Derrick Webb ("Webb") (Ex. M, ¶¶ 18, 19) to refute this is unavailing. Webb states that he was placed back into his original day-off group upon return from medical leave, but Webb's personal experience is not alleged to be City policy. In addition, it is not clear whether Webb took medical leave beyond the FMLA provisions, while Porter took extended medical leave totaling nine months. Moreover, Webb states that Porter's day-off group should not have been switched because she had "more seniority" than other employees in her group, but that does not indicate that the City is required to place all employees returning from leave into their original day-off group.

she could not go to church.  (Pl. 56.1 Resp. ¶¶ 44-46.)

On August 25, 2006, Porter filed a Chicago Commission on Human Relations ("CCHR") complaint against the City, Sidor, and Perfetti alleging religious discrimination.[4]  (*Id*. ¶ 7.)  On September 14, 2006, Porter filed a charge alleging religion-based discrimination with the Equal Employment Opportunity Commission ("EEOC").  (*Id*.)

Porter was absent from work on some or all of thirty-four days between July 16, 2006 and November 19, 2006, not counting her regularly-scheduled days off.  (Def. 56.1 Add. Resp. ¶ 100.) Of the thirty-four days that Porter was absent, sixteen of them were Sundays.  (*Id*.)

Porter was issued a Counseling Session Report ("CSR") on November 12, 2006 by Sergeant Chambers ("Chambers") regarding her "pattern" of requesting Sundays off either through the use of vacation days, medical leave, or "absent no pay" days.  (Def. 56.1 Resp. ¶ 40.)  According to the CSR, rather than alleging that she was attending religious services, Porter explained her Sunday absences instead on health issues due to her "chest hurt[ing] after working (5) days" and the fact that she "has a (7) month old baby she has to hold which she holds in a special way."  (Pl. 56.1 Resp. ¶ 35.)  Porter also stated that she "was on a pattern of being sick from July to November" and that she was "not intentionally taking off on Sunday."  (*Id*.; Def. Exh. 25, Counseling Session Report.)  Porter was informed that her pattern of taking days off was "unacceptable and could lead to disciplinary action."  (Def. 56.1 Resp. ¶ 40.)  The CSR, however, contained preprinted text stating that it was "not a disciplinary action."  (Pl. 56.1 Resp. ¶ 36.)

Porter requested medical leave on November 14, 2006, stating in her request that it was "due

---

[4] Porter's original CCHR complaint alleged age-based and religious discrimination but she later withdrew her age-based claim.

to chronic pain and physical therapy"; Porter subsequently took a medical leave of absence on November 16, 2006 and has not returned to the FSS.  (Def. 56.1 Resp. ¶¶ 37-19.)

The CCHR issued an order finding "substantial evidence of discrimination based on religion" on October 2, 2008.  (Pl. 56.1 Resp. ¶ 8; Def. 56.1 Resp. ¶ 49.)

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion.  *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chi. Sch. Reform Bd. Of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000).  Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment.  An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate.  *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.").

## <u>DISCUSSION</u>

Because the determination of whether the City reasonably accommodated Porter requires an analysis of whether Porter's religious practices conflicted with her employment, the Court will begin its discussion with Count II, followed by Count I and Count III.

## I.     Count II: Religious Discrimination and Harassment

In order to establish a *prima facie* case of religious discrimination, a plaintiff must show: (1) that a bona fide religious observance or practice conflicts with an employment requirement; (2) that the plaintiff called the religious observance or practice to her employer's attention; and (3) that the religious observance or practice was the basis for an adverse employment decision.  *See E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1575 (7th Cir. 1996); *E.E.O.C. v. United Parcel Serv.*, 94 F.3d 314, 317 (7th Cir. 1996).

### A.     Conflicting Religious Observance or Practice

An employee must demonstrate that a bona fide religious observance or practice conflicts with her employment.  *See UPS*, 94 F.3d at 317.  The term "religion" in Title VII includes all aspects of religious observance and practice.  42 U.S.C. § 2000e(j).

Here, the City scheduled Porter to have Fridays and Saturdays off when she returned to her position at the FSS in July 2006.  Porter alleges that this schedule—requiring her to work on Sundays—conflicted with her desire to attend church on Sundays.  In support of this claim, Porter states that her Sunday shift was from 7:30 a.m. to 3:30 p.m. and that the church she attends holds services on Sundays at 9:00 a.m., 11:45 a.m., and, according to her deposition, "sometimes" at 4:00 p.m.  Porter's church also offers Sunday School at 8:00 a.m. on Sunday.

The Court first notes that Porter's request was for something that she preferred to do, not

something that her religion obligated her to do. She has never alleged that she must attend a particular service on a particular day or time due to her religious obligations; instead, the undisputed facts show that Porter's schedule for an extended period of her employment at the FSS included every-other Sunday off, requiring her to work on alternate Sundays. Porter never complained until March 2005 that this schedule interfered with her ability to practice her religion. *Cf. UPS*, 94 F.3d at 319 (noting that a conflict was apparent where an employee's religion required him to wear a beard but his employer's policy prohibited facial hair for the specific job that he was seeking). Nonetheless, the Court recognizes that an employee's religious practice or observance need not be a compulsory one to be protected by Title VII. *See Redmond v. GAF Corp.*, 574 F.2d 897, 900 (7th Cir. 1978) ("[W]e do not feel the protection of Title VII is limited" to situations where "a practice is specifically mandated or prohibited by a tenet of the plaintiff's religion."). Therefore, the Court will assume that Porter's request to attend church on Sundays can give rise to Title VII protections if that request is based on a conflict with the employee's work schedule to the extent that it infringes on her ability to pursue her religious practices. *See, e.g., Silk v. City of Chi.*, 1996 WL 312074 at *21 (N.D. Ill. Jun. 7, 1996) (Coar, J.) (finding that plaintiff failed to allege a *prima facie* case because he did not allege "that he actually abandoned or could not otherwise pursue his religious practices" as a result of his employer scheduling him to work certain hours on weekends).

Porter, however, has failed to establish that working on Sundays from 7:30 a.m. to 3:00 p.m. precluded her from attending church.[5] *See, e.g., id.* (noting that employees "certainly do[] not have a constitutional right to attend a *convenient* mass. To claim that [plaintiff] has been denied freedom

---

[5] While Porter claims that her church "sometimes" offers 4:00 p.m. Sunday service, she does not claim to have tried unsuccessfully to attend the 4:00 p.m. service after her shift ended.

of religion because he cannot attend the precise mass of his choice borders on frivolity.") (emphasis in original). To the extent that Porter claims that her religious practice includes singing in her church's choir, which only occurs on Sunday mornings at a time that conflicts with her employment, the Court need not determine whether singing in choir constitutes a bona fide religious observance or practice because Porter's *prima facie* case fails for other reasons—specifically, her inability to demonstrate an adverse employment action. *See Adams v. Retail Ventures, Inc.*, 325 Fed. App'x 440, 442 (7th Cir. 2009) (assuming that the employee had demonstrated a *prima facie* case but noting that the district court found an employee's "insistence on attending every service offered by his church was not a bona fide requirement of his religion"). The Court therefore assumes, without deciding, that Porter has satisfied this element of her *prima facie* case.

### B. Called to the Employer's Attention

In order to satisfy her obligation of demonstrating an adverse employment action, Porter must first call her religious observance or practice to her employer's attention. *See Ilona of Hungary*, 108 F.3d at 1575. "A person's religion is not like his sex or race—something obvious at a glance. Even if he wears a religious symbol, such as a cross or a yarmulka, this may not pinpoint his particular beliefs and observances; and anyway employers are not charged with detailed knowledge of the beliefs and observances associated with particular sects." *Reed v. Great Lakes Cos., Inc.*, 330 F.3d 931, 935-36 (7th Cir. 2003). The employee, therefore, "has the duty to inform his employer of his religious needs so that the employer has notice of the conflict." *Redmond*, 574 F.2d at 902.

Here, while the parties dispute whether and to what extent Porter called her religious practices to her supervisors's attention, the Court, construing the facts in Porter's favor, finds that Porter has satisfied this element. Perfetti stated in his deposition that he understood that Porter

wanted to take Sundays off because she was involved in her church. Therefore, even though Perfetti later stated that he never received a formal request from Porter, and that she ever explained what she did at her church, the Court construes Perfetti's understanding as an awareness of Porter's perceived conflict between her religious practices and her employment. Moreover, Porter filed a similar request in 2005 based on her desire to attend ministry classes, a request that was accommodated, albeit for a limited time. Further, Porter filed complaints with the CCHR and the EEOC claiming that she was being discriminated against because of her religion, stating specifically that she was seeking to have Sundays off so she could go to church.

The Court finds that Porter made the City sufficiently aware of what she perceived to be a conflict between her religious observances and her employment and has therefore satisfied this element of her *prima facie* case.

### C.  Adverse Employment Action

Once she calls attention to this perceived religious conflict to her employer, Porter must demonstrate that her religious observance or practice was the basis for an adverse employment action. *See UPS*, 94 F.3d at 317. An adverse employment action is one where the conditions in which an employee works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or an otherwise significantly negative alteration in her workplace environment. *See O'Neal v. City of Chi.*, 392 F.3d 909, 911 (7th Cir. 2004). An adverse employment action must be materially adverse, not merely an inconvenience or a change in job responsibilities. *See Hilt-Dyson v. City of Chi.*, 282 F.3d 456, 465 (7th Cir. 2002). Not everything that makes an employee unhappy is an adverse employment action; an adverse action is one that significantly alters the terms and conditions of the employee's job. *See Stutler v. Ill. Dep't of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001).

Here, Porter claims her adverse employment action took two forms: she was disparately treated and she was subjected to a hostile work environment. Specifically, Porter alleges that she was placed in an unfavorable work schedule; was threatened with being written-up in a Complaint Register by McCarthy for coming to work on a day that she was not scheduled to be there; that Perfetti refused to initiate an investigation into her reported harassment; that she was issued a CSR for using approved leave time to miss some or all of thirty-four days over a four-month period; that she was yelled at and taunted; that she was intimidated and followed around the office; and that a supervisor called her "church girl." These claims, however, do not rise to the level of an adverse employment action or demonstrate a hostile work environment. Nor do they demonstrate an actual interference with Porter's ability to practice her religion.

A change in a plaintiff's work schedule does not support a claim of an adverse employment action. *See Grube v. Lau Indus., Inc.*, 257 F.3d 723, 728 (7th Cir. 2001) (noting that an employer's "decision to change [plaintiff's] working hours certainly does not rise to the level of an adverse employment action."). Moreover, Porter does not allege that she suffered a reduction in her level of pay or the rate that her benefits accrued when she was placed in the Friday/Saturday day-off group, either due to her work schedule or any other action taken by the City. *See id*.

Porter does not allege that she was constructively discharged and the undisputed evidence demonstrates that her unfavorable performance reviews did not amount to actual discipline. *See Oest v. Ill. Dep't of Corrs.*, 240 F.3d 605, 613 (7th Cir. 2001) (noting that "unfavorable performance evaluations" and "oral or written reprimands" received under "a progressive discipline system" did not sufficiently implicate a tangible job consequence). Here, Porter's CSR was the first step in a progressive discipline system, according to her AFSCME contract, that did not have an effect on

Porter's work, hours, or rate of pay.  (Pl. 56.1 Add. Facts. Ex. 101.)  The CSR also stated on its face that it was not a disciplinary action.  As such, the CSR did not constitute an adverse employment action.

Porter's claim that she suffered a materially adverse employment condition when she was forced to use her vacation time and unpaid days off to take leave on sixteen Sundays from July 2006 through November 2006, is incomplete.  The Court first notes that Porter's own stated reasons in the CSR belie her assertion that she explicitly stated that she was taking these days off to attend religious services.  Instead, she stated that she took the days off for her health.  As such, any loss of vacation time or other benefits were not due to Porter's inability to accommodate her religious practices with her employment, but rather to accommodate her medical condition and her baby.  In fact, Porter explicitly stated that she was not intentionally taking Sundays off.  In addition, her AFSCME contract and the Municipal Code state that if she were to insist on taking time off for religious accommodation, she would do so without pay and would have to make those days up at a date consistent with the operational needs of her employer.

### i.  Hostile Work Environment

Porter's other purported adverse employment action is that she was subjected to a hostile work environment.  A workplace is considered a hostile work environment where the harassment is sufficiently "severe or pervasive to alter the conditions of employment and create an abusive working environment."  *Ezell v. Potter*, 400 F.3d 1041, 1047 (7th Cir. 2005).  Porter must establish that the workplace was both subjectively and objectively offensive.  *See Rogers v. City of Chi.*, 320 F.3d 748, 752 (7th Cir. 2003).  A workplace is subjectively offensive when the plaintiff actually perceives it as such; it is objectively offensive when a reasonable person would find it hostile or

abusive.  *See Ezell*, 400 F.3d at 1047-48.  The Court looks to the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.  *See id.*

Here, the alleged verbal harassment that Porter suffered—being called a "church girl" once, being yelled at and taunted, and being told to return to her desk—does not rise to the level of an adverse employment action or a hostile work environment.  Generally, hostile comments do not qualify as actionable adverse employment actions unless the hostility was severe and pervasive.  *See Hilt-Dyson*, 282 F.3d at 466.  Rude and inappropriate comments are not necessarily severe enough to change the conditions of a plaintiff's employment.  *See Ezell*, 400 F.3d at 1048 (ignorant stereotypes made by plaintiff's supervisor did not constitute a hostile work environment); *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675 (7th Cir. 2005) (boorish behavior is not necessarily age harassment).  Porter's complaint of a couple of isolated incidents over four months, including allegedly ignorant stereotypes made by her supervisor—calling her "church girl"—does not demonstrate that any verbal harassment that she suffered was severe or pervasive.  *See Hilt-Dyson*, 282 F.3d at 466; *Rizzo v. Sheahan*, 266 F.3d 705, 718 (7th Cir. 2001) (finding "threats, phone calls, and inconveniences [plaintiff] faced at work did not 'alter[] the terms or conditions' of her employment such that they can be characterized as adverse employment actions"); *Speer v. Rand McNally & Co.*, 123 F.3d 658, 664 (7th Cir. 1997) (finding that plaintiff did not suffer an adverse employment action when her boss yelled at her and "did not make her feel as if she was part of the work group").  Similarly, Porter's allegations that she was yelled at and taunted are too vague to substantiate a hostile work environment claim.  *See Oest*, 240 F.3d at 615 (uncorroborated generalities are insufficient to support an employment discrimination claim at summary judgment).

Moreover, during the four months—July 2006 to November 2006—that Porter alleges that she was subjected to a hostile work environment, there is no indication that the level of her job performance decreased or that she performed her job in an unsatisfactory manner. *See Griffin v. Potter*, 356 F.3d 824, 830 (7th Cir. 2004) (noting that a supervisor's alleged harassing conduct did not interfere with plaintiff's ability to do her job and therefore weighed against a finding of a hostile work environment) (citation omitted).

To the extent that Porter alleges that her religious discrimination claim is evidenced by her suffering disparate treatment, that claim is also unsupported by the facts. First, Porter is unable to demonstrate that she suffered an adverse employment action or that she was subjected to a hostile work environment. Second, the City established, and Porter did not adequately refute, that it has no obligation under its CBA with AFSCME to assign employees returning from leave to their earlier day-off group. Third, the City identified a civilian employee who returned from a seven-month leave of absence and was placed into a different day-off group.

Therefore, Porter has failed to establish a *prima facie* case of religious harassment or discrimination and the Court grants summary judgment to the City on Count II.

## II. Count I: Reasonable Accommodation

Title VII requires employers to make reasonable efforts to accommodate the religious practices of employees unless doing so would cause the employer an undue hardship. *See* 42 U.S.C. § 2000e(j); *Reed v. Great Lakes Cos., Inc.*, 330 F.3d 931, 934-35 (7th Cir. 2003). "Title VII, however, requires only 'reasonable accommodation,' not satisfaction of an employee's every desire." *Wright v. Runyon*, 2 F.3d 214, 217 (7th Cir. 1993). Title VII does not contemplate "unequal treatment" between those employees with religious reasons for avoiding working on certain days and

those who have "strong, but perhaps nonreligious reasons for not working on weekends." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 81 (1977).

"The burden of making a reasonable accommodation or of showing that any accommodation would result in undue hardship lies with the employer." *Ilona of Hungary*, 108 F.3d at 1576. "A reasonable accommodation of an employee's religion is one that 'eliminates the conflict between employment requirements and religious practices.'" *Wright*, 2 F.3d at 217 (citation omitted). Once the employer has offered an alternative that reasonably accommodates the employee's religious needs, the statutory inquiry is at an end. *See Ilona of Hungary*, 108 F.3d at 1576 (quotation marks and citation omitted). The employer "need not also show that other accommodations preferred by the employee would cause it undue hardship." *Id*. If, however, the employer does not demonstrate that it attempted a reasonable accommodation, the employer must "demonstrate that any accommodation would have caused it undue hardship." *Id*. An "undue hardship," pursuant to § 2000e(j), is "a cost to the employer that is anything more than de minimis." *Id*.

Assuming, as it did in its analysis of Porter's religious discrimination claim, that Porter's bona fide religious obligations did in fact conflict with her employment requirements, the Court nonetheless finds that the City attempted to reasonably accommodate any conflict alleged by Porter. Specifically, Porter concedes that her supervisor, Hegarty, spoke to her about switching Porter's Sunday hours to the 3:30 p.m. to 11:30 p.m. shift to accommodate her desire to attend church on Sunday mornings. (Pl. 56.1 Add. Facts Ex. 95.)

In *Wright*, the Seventh Circuit held that an employer reasonably accommodated its employee by "inviting him to bid on four open 'weekends off' positions" that would have enabled the employee to obtain a position that did not interfere with his religious practices. *See Wright*, 2 F.3d

at 217.  Moreover, the Seventh Circuit noted that the employee's classification of the four open positions as "nonpreferrable" was irrelevant because the requisite skill was "essentially equivalent" to the employee's prior position and the employee was not required to "accept a reduction in pay or some other loss of benefits." *Id*.  Here, similarly, the City's offer to Porter to request a switch of her Sunday hours is a reasonable accommodation, one that Porter chose not to act on.  The changed hours would not have altered Porter's pay or benefits, or required her to perform at a lower skill level, but they would have allowed her to attend the Sunday morning services offered by her church. The Court notes that the City's offer to work with Porter to change her Sunday work hours is consistent with its accommodation of her in 2005 when she changed her Saturday work hours to attend ministry classes at her church.

The City also claims, and Porter does not adequately refute, that it asked other civilian employees to volunteer to switch their schedules with Porter, but none accepted.  *See Hardison*, 432 U.S. at 81 ("There were no volunteers to relieve [plaintiff] on Saturdays, and to give [plaintiff] Saturdays off, TWA would have had to deprive another employee of his shift preference at least in part because he did not adhere to a religion that observed the Saturday Sabbath.").

Therefore, the Court finds that the City attempted to reasonably accommodate any conflict Porter faced between her religious practices and her employment.  As such, the Court need not address whether the City would have suffered an undue hardship if it had to accommodate Porter's request.  *See Wright*, 2 F.3d at 217; *see, e.g., Filinovich v. Claar*, 2005 WL 2709284 at *5 (N.D. Ill. Oct. 19, 2005) (Darrah, J.) (undue hardship occurs when altering employees's schedules would impact collectively bargained-for shift preference or negatively impacts co-workers's compensation and time off).

### A. Injunctive Relief

Porter moves for injunctive relief based on the City's alleged policy regarding religious accommodation.

Title VII authorizes injunctive relief "once the court has found that the defendant intentionally engaged in an unlawful employment practice." *Ilona of Hungary*, 108 F.3d at 1578. An employee need not demonstrate a pattern of conduct; courts instead look to "whether the discriminatory conduct could possibly persist in the future." *Id*. at 1578-79. Injunctive relief may be appropriate "where the individuals who were found to have discriminated remain the defendant's primary decision-makers." *Id*. at 1579.

Here, the Court has already found that the City did not intentionally engage in an unlawful employment practice and did not cause Porter to suffer an adverse employment action. Therefore, Porter cannot seek injunctive relief. *See id*. at 1578. Moreover, to the extent that Flores and other Sergeants misrepresented the City's policy towards religious accommodation, the City and the Sergeants nonetheless reasonably accommodated Porter's request in compliance with Title VII and the Municipal Code.

Therefore, the City reasonably accommodated Porter's religious practices and Porter is unable to demonstrate that she is entitled to seek injunctive relief. As such, the Court grants summary judgment to the City on Count I.

### III. Count III: Retaliation

Title VII prohibits employers from discriminating against employees who engage in a protected activity. Protected activities include those that employees engage in to oppose a practice made unlawful by Title VII, including participating in investigations. *See Hatmaker v. Mem'l Med.*

*Ctr.*, 619 F.3d 741, 745 (7th Cir. 2010). To demonstrate an adverse retaliatory action, a plaintiff must show that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) (internal quotations omitted). Anti-retaliation statutes protect an individual from retaliation that produces an injury or a harm, not from all retaliation. *See id.* Snubbing, petty slights, and minor annoyances do not create such deterrence. *See id.* at 68-70. A plaintiff may prove retaliation by using either the direct method or the indirect method. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662 (7th Cir. 2006).

As an initial matter, the Court finds that Porter engaged in several forms of protected activity after she returned from leave in July 2006. Porter's schedule shift, however, occurred before she returned to work in July 2006 and, therefore, before she engaged in any protected activity. As such, Porter cannot demonstrate a causal connection under the direct method. *See Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 676 (7th Cir. 2011) ("When a retaliation claim is based on suspicious timing, the order of events is even more important than the time between them; the theory doesn't work if the retaliatory act precedes the protected activity.") (internal quotation marks and citations omitted); *Oest*, 240 F.3d at 616. Nor can Porter, for the reasons discussed above, demonstrate that she suffered an adverse employment action, a necessary element to a retaliation claim pursuant to the indirect method. *See Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 560 (7th Cir. 2004) (noting that "failure to satisfy any one element of the prima facie case is fatal to an employee's retaliation claim.").

Therefore, Porter's retaliation claim fails. The Court grants summary judgment to the City

on Count III.

## **CONCLUSION**

The Court finds that the City reasonably accommodated Porter's religious obligations and did not discriminate or retaliate against her. As such, the Court denies Porter's Motion for Summary Judgment and her Motion for Declaratory Judgment. The Court grants the City's Motion for Summary Judgment. The case is closed.

So ordered.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: March 31, 2011